IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EDDIE DESHAWN VAUGHN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>COMMISSIONER OF )<br>SOCIAL SECURITY, )<br>)<br>Defendant. ) | Case No. 1:21-CV-01373<br><br>JUDGE DAVID A. RUIZ<br><br>MAGISTRATE JUDGE<br>THOMAS M. PARKER<br><br><br><br>**REPORT AND**<br>**RECOMMENDATION**[1] |

Plaintiff, Eddie Deshawn Vaughn, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  He challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating the opinions of the state agency consultants.  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating the opinions, I recommend that the Commissioner's final decision denying Vaughn's application for SSI be vacated and that Vaughn's case be remanded for further consideration.

**I.      Procedural History**

Vaughn applied for SSI on April 11, 2018.  (Tr. 134-138).[2]  He said he became disabled on May 10, 2017, due to: (1) coronary heart disease, (2) lipidemia, (3) congestive heart failure,

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).
[2] The administrative transcript appears in ECF Doc. 7.

(4) kidney disease, (5) depression, (6) diabetes, (7) asthma, (8) hypertension, and (9) high cholesterol. (Tr. 189, 192). The SSA denied Vaughn's application initially and upon reconsideration. (Tr. 47-61, 64-78).

ALJ George Roscoe heard Vaughn's case on September 9, 2019 and denied the claim in a September 23, 2019 decision. (Tr. 20-31, 36-46). In doing so, the ALJ determined at Step Four of the sequential evaluation process that Vaughn had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations:

> [N]o climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no concentrated exposure to temperature extremes, humidity or environmental pollutants; and no exposure to hazards (heights, machinery, commercial driving).

(Tr. 25). Based on vocational expert testimony that a hypothetical individual with Vaughn's age, experience, and RFC could work in such available positions as a touch-up screener, final assembler, and lens inserter, the ALJ determined Vaughn wasn't disabled. (Tr. 30-31). On May 18, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). And, on June 16, 2021, Vaughn filed a complaint to obtain judicial review. ECF Doc. 1.

**II.     Evidence**

    **A.     Personal, Educational, and Vocational Evidence**

Vaughn was born on April 15, 1972 and was 45 years old on the alleged onset date. (Tr. 202). Vaughn had his GED but did not indicate any specialized training. (Tr. 43, 209-210).

    **B.     Relevant Medical Evidence**

Vaughn summarizes the evidence in his brief, generalizing the medical evidence related to his disabling conditions. ECF Doc. 8 at 3-5. The Commissioner's brief does likewise. ECF Doc. 9 at 3-6. Neither party contests the objective medical evidence, nor the ALJ's summary of

it. *See generally* ECF Doc. 8; ECF Doc. 9. Independent review does not reveal any material inconsistencies with the ALJ's summary of such evidence and the record before this court. *Compare* (Tr. 25-29) *with* (Tr. 273-2090). Because of the limited nature of the parties' contentions, a fully summary of the record is unnecessary, and I adopt the following abbreviated summary of the objective medical evidence from the ALJ's decision.[3]

> In May of 2017, [Vaughn] was hospitalized after presentation with hypertensive crisis and [non-ST-elevation myocardial infarction] [c]ardiac catherization showed multiple severe stenosis in the R[ight] C[oronary] A[rtery] ["RCA"], moderate to severe disease in the L[eft] A[nterior] D[escending artery] and moderate disease in the O[cculsion] M[yocardial] I[nfarction]. [Tr. 892.] . . . He underwent stenting to the RCA. (10F/10 [*Id.*]) . . .
>
> It was noted in June of 2017 that the claimant presented with past medical history of hypertension and diabetes mellitus, recently has non-ST-elevation myocardial infarction with stent placement. [Tr. 575]. He presented complaining of shortness of breath and dyspnea on exertion. [*Id.*] He was also feeling depressed and had some suicidal thoughts and had orthopnea and paroxysmal nocturnal dyspnea. [*Id.*] . . .
>
> The claimant presented for follow up in April of 2018 for controlled type II D[iabetes] M[ellitus]. [Tr. 591.] He was taking metformin and tolerating it well as long as he takes it with his meals. [*Id.*] His weight was coming down intentionally. [*Id.*] He walks his dogs often to stay active. (6F/5 [*Id.*]). Extremities were normal. [Tr. 593.] No deformities, edema, or skin discoloration. [*Id.*] . . .
>
> On June 15, 2018, the claimant presented with 4-5 days of increasing blood sugar. [Tr. 32.] He states he really feels pretty normal but he began to notice his blood sugar at 400 or higher the last 45 days he could not account for. [*Id.*] . . . The claimant presented on June 28, 2018, stating that he was doing well. [Tr. 313.] . . . [H]is blood sugars have been between 100-150s in am and before bed. [*Id.*] He was alert and oriented to person, place, and time. [Tr. 315.] He displays normal reflexes. [*Id.*] No cranial nerve deficit. [*Id.*] He exhibits normal muscle tone. [*Id.*] Gait was normal. [*Id.*] Memory and judgment were normal (3F/43 [*Id.*]).

---

[3] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 7787 (6th Cir. 2017), *aff'd* by 139 S. Ct. 1148 (2019). *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

A sleep study was performed in June of 2018. [Tr. 421.] The findings were consistent with severe obstructive sleep apnea. [*See* Tr. 421-423.] . . . An echocardiogram was also recorded in June. [Tr. 1622.] It noted an abnormal ECG. [*Id.*] . . . Findings were noted to be consistent with hyprtrophic obstructive cardiomyopathy. [*Id.*] . . . An x-ray of the chest showed normal cardiomediastinal silhouette for technique. [Tr. 1653.] No acute osseous abnormality was identified. (15F/136 [*Id.*]).

The claimant attended a psychological consultative examination in July of 2018. [Tr. 263.] He was dressed neatly and appropriately for the evaluation as well as for the current season. [Tr. 267.] His gait and his posture were unremarkable. [*Id.*] His verbalizations were fairly easily understood and intelligible. [*Id.*] The rate of his speech and the volume fell within the low average range. [*Id.*] His overall affect appeared to be slightly constricted and the mood appeared to be slightly depressed. [Tr. 268.] He was well oriented to time, place and person. [*Id.*] He takes care of his hygiene daily. [Tr. 269.] . . . He uses a phone daily and talks to her mother, brother, girlfriend and a few friends. [*Id.*] He operates the TV daily. [*Id.*] He plays board games daily involving Chess for 2 hours with his cousin and his friend's son. [*Id.*] He uses the internet daily. (See 2F [*Id.*]).

The claimant had an echocardiogram performed in July of 2018. [Tr. 392.] It revealed that the left ventricle is small. [Tr. 394.] There is severe septal left ventricular hypertrophy. [*Id.*] . . . Indeterminate left ventricular diastolic dysfunction. [*Id.*] The right ventricle is normal in size. [*Id.*] Right ventricular systolic function is normal. [*Id.*] . . .

An exam from August of 2018 noted that the claimant was oriented to person, place, and time, and was in no distress. [Tr. 281-282.] He is alert and oriented to person, place, and time. [Tr. 282.] He displays normal reflexes. [*Id.*] No cranial nerve deficit. [*Id.*] He exhibits normal muscle tone. [*Id.*] Gait was normal. [*Id.*] Coordination was normal. [*Id.*] His memory and judgment were normal. (3F/10 [*Id.*]). He denied any shortness of breath or chest pain. [Tr. 285.] He states he does not get swelling in legs or feet. [*Id.*] He states he may feel some bloating when his shortness of breath episodes come on. [*Id.*] He agreed to weights daily and stated he has a functioning scale at home. [*Id.*] He states he eats a low sodium diet but not give many examples. (3F/13 [*Id.*]).

In September of 2018, the claimant presented for pulmonary functioning testing. [Tr. 259-260.] . . . It was noted that the claimant had mild restrictive ventilator impairment. (1F/2 [Tr. 260]). On September 20, he stated he was feeling "pretty good." [Tr. 896.] He had been taking his dogs for a walk twice daily for 10-15 minutes until he "feels winded." [*Id.*] . . .

In November of 2018, it was noted that the claimant continued to have dyspnea and chest pain with exertion. [Tr. 1319-1320.] However, it had improved since he started Imdur. [Tr. 1320.] On exam, his heart had a regular rhythm, no murmur, no rub of gallop, and lungs were clear to auscultation. [*Id.*] His

> extremities had no edema and he had a normal gait. [*Id.*] He was alert and oriented, and was appropriate and cooperative. (13F/198 [*Id.*]).
>
> In March of 2019, the claimant stated that he feels like something squeezing his lungs and that when he exerts himself he feels like there is something sitting on his chest and he cannot take a deep breath. [Tr. 1391.] He does have a history of coronary artery disease and had a recent stress test that looked okay. [*Id.*] He does report some mild pain with deep breathing and then severe shortness of breath with exertion where he can walk down his driveway to get the mail without getting significantly shortness of breath. [*Id.*] . . . He was negative for chest pain, leg swelling and palpitations. [Tr. 1395.] He was negative for joint pain or swelling, back pain, and muscle pain. [*Id.*] He was negative for focal numbness or weakness, headaches and dizziness. (13F/273 [*Id.*]).
>
> A CT of the claimant's chest was taken in March of 2019. [Tr. 1411.] It showed thoracic inlet, heart, and mediastinum. [*Id.*] . . . Scattered coronary artery atherosclerotic calcifications are noted, with P[ercutaneous] C[oronary] I[ntervention] stents in the RCA, although the study was not optimized for coronary assessment. [*Id.*] No pericardial effusion or thickening. [*Id.*] Bones and soft tissues: No destructive bone lesion. [*Id.*] Chest wall soft tissues were unremarkable. (13F/289 [*Id.*]).
>
> An exam from April of 2019 noted that the claimant was in no acute distress. [Tr. 1443.] He had no peripheral edema. [*Id.*] He had regular rate and rhythm. . . . [*Id.*] Normal respiratory effort was noted. [*Id.*] He ambulated without assistance. [*Id.*] He was alert and oriented. [*Id.*] He had normal mood and affect. [*Id.*] His lungs were clear bilaterally. (13F/321 [*Id.*]). In May, the claimant was well appearing, alert, in no acute distress, well-hydrated, and obese. [Tr. 1493.] He had no wheezing or rhonchi. [*Id.*] Extremities were normal. [*Id.*] No deformities, edema, or skin discoloration. (14F/17 [*Id.*]).
>
> * * * In this case, the claimant's obesity has [*sic*] found to significantly limit the claimant's ability to do basic work activities, and therefore, is severe. [*See* Tr. 259-261, 273-564, 587-869, 877-941, 1123-1476.]

(*See* Tr. 25-29).

### C. Relevant Opinion Evidence

#### 1. Consultive Examiner – Eulogio Sioson, M.D.

On September 26, 2018, Eulogio Sioson, M.D., evaluated Vaughn's pulmonary functioning. (Tr. 259-261). After conducting spirometric testing, he found that Vaughn had a mildly restrictive ventilatory impairment. (Tr. 260).

5

### 2. Consultive Examiner – Herschel Pickholtz, Ed.D.

On February 16, 2018, Vaughn underwent a psychological evaluation with psychologist Herschel Pickholtz, Ed.D. (Tr. 263-272). Dr. Pickholtz found that Vaughn's verbal IQ fell within the average range and his capacities to understand, remember, and carry out instructions did not reflect any impairment. (Tr. 271). He also found that Vaughn's capacity to pay attention, concentrate, and maintain persistence and pace was within the average range. *Id.* Further, there was nothing suggestive of significant impairment with Vaugh's ability to function in a work setting, but he was slightly impaired with his ability to response to work pressures. *Id.*

### 3. State Agency Consultants

#### a. Physician Consultants

On June 10, 2018, Leon D. Hughes, M.D., reviewed the medical evidence in support of Vaughn's physical limitations. (Tr. 57-59). Dr. Hughes found that Vaughn had the following exertional limitations, he could: occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for 6 hours in an 8-hour day, sit for 6 hours in an 8-hour day, and was unlimited in his pushing or pulling. (Tr. 57-58). He also found that Vaughn had the following postural limitations, he could: occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and had no manipulative limitations. (Tr. 58). Dr. Hughes also opined that Vaughn had various environmental limitations. *Id.*

On September 27, 2018, Rannie Amiri, M.D., reconsidered the medical evidence in support of Vaughn's physical limitation. (Tr. 73-76). Dr. Amiri found the same exertional limitations as Dr. Hughes. (Tr. 74). Dr. Amiri, however, disagreed with Dr. Hughes's postural limitations, finding the following limitations instead: occasionally climb ramps or stairs; never

6

climb ladders, ropes, or scaffolds; was unlimited in his balancing, kneeling, and crouching; and occasional crawling. (Tr. 74). Dr. Amiri also found that Vaughn was limited in his ability to reach to the left over his head but was otherwise unlimited in his manipulative abilities. (Tr. 75). Dr. Amiri also found lesser environmental limitations than Dr. Hughes, though some limitation still existed. (Tr. 75-76).

### b. Mental Health Consultants

On July 18, 2018, Patricia Kirwin, Ph.D., reviewed the medical evidence related to Vaughn's mental health to assess whether he had any limitations. (Tr. 55). She found that none of his symptoms were causing any severe functional limitation at that time. *Id.* On August 27, 2018, Vicki Warren, Ph.D., reconsidered the medical evidence regarding Vaughn's mental health and affirmed Dr. Kirwin's findings. (Tr. 71-72).

### D. Relevant Testimonial Evidence

Vaughn testified at the hearing. (Tr. 39-42). He stated that he was unable to work because, when he had last worked, he had problems "not knowing I was unhealthy for it. Then . . . I had a heart attack." (Tr. 39). He was diagnosed with coronary artery disease, congestive heart failure, and kidney disease. (Tr. 39). He also had three stents put into his chest and had once passed out due to his heart problems. (Tr. 39-40). Vaughn confirmed that he was on medication for diabetes and explained that he had issues with his breathing, having about 36 to 38 percent lung capacity. *Id.* Vaughn also confirmed that he had numbness in his left shoulder and had obstructive sleep apnea. (Tr. 41). When asked to describe his typical day, Vaughn explained that, when he got up in the morning, he would take his dog for a walk down the block and back. *Id.* He could only walk for between 2 to 5 minutes before his chest hurt. *Id.* He also mentioned that he had severe COPD and kidney disease. (Tr. 42).

**III. Law & Analysis**

    **A. Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

8

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

        **B.**         **Step Four: Weighing Medical Opinion Evidence**

Vaughn contends that the ALJ erred in evaluating the state agency experts' opinions. ECF Doc. 8 at 7. Vaughn asserts that by evaluating the state agency experts' opinions in combination and failing to distinguish between the mental health and physical opinions or the specific doctors, the ALJ failed to properly explain his decision and provide sufficient explanation to allow for meaningful review. ECF Doc. 8 at 7-8. Additionally, he contends, based on the ALJ's statement that the opinions were unpersuasive to the extent they were inconsistent with the RFC, that the ALJ conducted his analysis "backwards" by evaluating the opinions in light of a "predetermined" RFC. *See* ECF Doc. 8 at 8-10. These errors, he argues, are particularly problematic as the ALJ found Dr. Amiri's opinion persuasive, but did not include a limitation to occasional overhead lifting (as Dr. Amiri did) in the RFC. ECF Doc. 8 at 9-10.

The Commissioner contends that the ALJ did not err, and the findings are supported by substantial evidence because: (1) the ALJ discussed the opinions' supportability and consistency; (2) the ALJ was only required to give a source-level articulation of persuasiveness; (3) the ALJ was not required to explain why certain limitations were not adopted in the RFC; and (4) substantial evidence supports the ALJ's decision and allows for meaningful review. *See* ECF Doc. 9 at 13-16. In his reply brief, Vaughn reiterates his arguments. *See generally* ECF Doc. 11.

9

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 416.920(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 416.920c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(1).[4] According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 416.920c(c)(1)-(2).

The ALJ failed to apply the proper legal standards when evaluating the state agency consultants' opinions. Here, the ALJ lumped four medical opinion sources into one paragraph and attempted to analyze them – together – under the regulations. This results in two significant errors: (1) an insufficient explanation of each source's supportability and consistency, and (2) an insufficient explanation of the rejection of certain source's opined limitations. Although the ALJ makes a consistency and, arguably, a supportability finding regarding the state agency consulting psychiatrists (but still failed to distinguish the two sources' opinions) no such analysis can be divined from his discussion of the medical evidence about Vaughn's physical conditions. (*See* Tr. 29). The ALJ's discussion of the opinions as to physical evidence is as follows:

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 416.920c(c)(3)-(5).

10

> The findings of the Disability Determination Services consultants are found to be persuasive to the extent they are consistent with the claimant's RFC. They opined that the claimant would be capable of a less than light exertional level . . . . Physically, while he had shortness of breath ambulating longer distances, he had normal muscular strength, and generally no wheezing o[r] shortness of breath.

(Tr. 29). From this, it is not only unclear which consultant the ALJ was specifically referencing but also what was inconsistent and what was supported. The only *reason* given (as opposed to a statement of fact) is that they were persuasive to the extent they were consistent with the ALJ's RFC – which implies exactly what Vaughn asserts: the ALJ determined his RFC before reviewing the state agency consultants' opinions. To say that such an approach would be sufficient to satisfy the regulation's discussion requirement and to build a logical bridge in the reader's understanding of the decision is a greater jump in logic than we can subscribe to. *See* 20 C.F.R. § 416.920c(c)(1)-(2); *Fleischer*, 774 F. Supp.2d at 877.

The Commissioner begs us to accept the ALJ's conflated approach, however, contending that the ALJ's decision not only satisfied the regulation's requirements but also asks us to find that the ALJ's discussion was adequate because only a source-level articulation was required; and the ALJ was not required to explain why individual limitations were not adopted from a non-examining source. *See* ECF Doc. 9 at 13-14. This argument is not well taken.

Despite instructing the court over the course of several pages about the new regulatory framework for the evaluation of medical opinions, the Commissioner's argument would have the court endorse an ALJ decision that flaunted those requirements. The Commissioner contends that "while Plaintiff asserts that the ALJ did not explain why certain limitations were not adopted into the RFC, this was not required under the prior *or current regulations* for non-examining sources." ECF Doc. 9 at 14. The Commissioner proceeds to list several cases in support – all of which were under the prior, inapplicable regulations. The only citation in support of this

statement applying under the new regulations is a citation to 20 C.F.R. § 416.920c, from which the Commissioner then returns to her source-level articulation argument.

The Commissioner's line of reasoning wholly ignores other regulations and this court's precedents which require an ALJ to explain his rejection of a medical source's opinion when the ALJ expressly finds that opinion persuasive. Specifically, SSR 96-8p provides that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, *the adjudicator must explain why the opinion was not adopted*." SSR 96-8p, 1996 SSR LEXIS 5, at *20. And this court has repeatedly enforced such requirements. *See Hoffer v. Comm'r of Soc. Sec.*, No. 3:20-CV-2871, 2022 U.S. Dist. LEXIS 34042, at *18-19 (N.D. Ohio Feb. 11, 2022) ("This Court recognizes that the ALJ need not address all limitations; however, where the RFC does not include the limitation, the ALJ must explain why the limitation was not included. . . . [Otherwise], this Court is left to speculate as to whether the ALJ intended to include the limitation but merely overlooked it or whether she did not find such limitation credible."); *Rager v. Comm'r of SSA*, No. 3:20-CV-1200, 2021 U.S. Dist. LEXIS 132882, at *18 (N.D. Ohio 2021) (same) *adopted* 2021 U.S. Dist. LEXIS 131570 (N.D. Ohio Jul. 15, 2021); *Perrine v. Berryhill*, No. 1:18-cv-49, 2019 U.S. Dist. LEXIS 49415, at *19-20 (N.D. Ohio, Mar. 25, 2019) (same). The Commissioner's contentions to the contrary are, therefore, not only wrong, but a misstatement of the law.

Here, Dr. Amiri found that Vaughn had manipulative limitations and he had different environmental limitations than those articulated by Dr. Hughes. (Tr. 75-76). The ALJ stated that Dr. Amiri's opinion was persuasive. (Tr. 29). But he did not include the manipulative limitations in his RFC. (*See* Tr. 25). Nor did he explain why he did not include the manipulative limitation or Dr. Amiri's reduced environmental limitations. Thus, the ALJ failed to build a

12

logical bridge between the evidence and his conclusion. *Fleischer*, 774 F. Supp.2d at 877. This failing alone would be a sufficient basis to recommend remanding the case. *See also Johnson v. Comm'r of Soc. Sec.*, No. 17-CV-3045-LTS, 2018 U.S. Dist. LEXIS 160181, at *14-17 (N.D. Iowa Aug. 27, 2018) (remanding a case where the ALJ "lumped all the state agency psychological opinions together" and failed to adopt on of the opinions' limitations, and collecting cases remanding in similar circumstances). But the ALJ's conflated, cursory discussion of four different medical source's opinions attempted to build a bridge too far for his readers to cross. *Fleischer*, 774 F. Supp.2d at 877. And the decision should be VACATED and REMANDED.

### IV. Recommendation

Because the ALJ failed to apply proper legal standards in evaluating the opinions of the state agency consultants, I recommend that the Commissioner's final decision denying Vaughn's application for SSI be vacated and that Vaughn's case be remanded for further consideration.

Dated: May 31, 2022

Thomas M. Parker
United States Magistrate Judge

---

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the

United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).